```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

SEABURY CONSTRUCTION CORP.,

                Petitioner,
                                         06 Civ. 2282 (RWS)
     - against -
                                         O P I N I O N
DISTRICT COUNCIL OF NEW YORK AND
VICINITY OF THE UNITED BROTHERHOOD
OF CARPENTERS AND JOINERS OF AMERICA,
AFL-CIO,

                Respondent.

-------------------------------------X

A P P E A R A N C E S:

     GREENBERG, TRAGER & HERBST
     Attorneys for Petitioner
     767 Third Avenue, 12th Floor
     New York, NY 10017
     By:  KALVIN KAMIEN, ESQ.
          Of Counsel

     O'DWYER & BERNSTEIN
     Attorneys for Respondent
     52 Duane Street
     New York, NY 10007
     By:  GARY SILVERMAN, ESQ.
          Of Counsel
```

**Sweet, D.J.,**

The respondent District Council of New York and Vicinity of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO ("District Council" or the "Respondent"), has moved to dismiss the petition of Seabury Construction Corp. ("Seabury" or the "Petitioner") to stay arbitration sought by the District Council pursuant to § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185. Seabury has cross-moved to enjoin arbitration. For the reasons set forth below, the motion of the District Council is granted, the cross-motion of Seabury is denied, and arbitration will be compelled.

## Prior Proceedings

On February 3, 2006, the District Council served upon Seabury a demand for arbitration and notice of hearing, pursuant to article IX section 3 of the Independent Millwright Agreement (the "2001 Agreement"), before Roger Maher, one of the arbitrators named in article IX section 3 of the 2001 Agreement.

On February 21, 2006, Seabury filed a petition and order to show cause in state court, seeking to permanently stay the arbitration. An ex parte preliminary injunction was granted, staying the arbitration until the motion could be heard. On March 23, 2006, the District Council removed the action to this Court.

1

The preliminary injunction expired on April 2, 2006 pursuant to Fed. R. Civ. P. 65(b).

The instant motions were marked fully submitted on July 26, 2006.

**The Facts**

On June 3, 1997, Seabury executed a collective bargaining agreement ("CBA") with the District Council, known as the Independent Millwright Agreement (the "1996 Agreement").[1] The term of the 1996 Agreement was from July 1, 1996 to June 30, 2001, renewing for one-year terms thereafter, unless either party gave notice of its intention to terminate the agreement between 90 and 60 days prior to the contract expiration date. (1996 Agreement, art. XV.)

On August 30, 2001, Seabury and the District Council executed an Interim Compliance Agreement (the "Interim Agreement") which extended the 1996 Agreement until such time as the District Council negotiated a successor Millwright Agreement. The Interim Agreement also stated that "all the terms of the . . . 'New

---

[1] The precise date of execution is unknown, as the signature of Seabury's representative, Albert Svede, is undated. The "Administration Form", which signatory companies file with the District Council on the day they execute an agreement or shortly thereafter, is dated June 3, 1997. However, the precise date of execution is irrelevant, as the Agreement applies retroactively to July 1, 1996. Seabury had previously been signatory to a Millwright Agreement that expired on June 30, 1996 (the "1993 Agreement").

2

Agreement' . . . including but not limited to, wages, fringe benefits, the arbitration provisions, and all other terms and conditions of employer . . . shall be binding on our firm, retroactive to July 01, 2001." (Interim Agreement, art. II.)

The 2001 Agreement was sent to Seabury on September 24, 2001. Seabury did not sign the 2001 Agreement.

The 2001 Agreement supersedes the 1996 Agreement, and applies retroactively to July 1, 2001 (see 2001 Agreement art. XVI; Interim Agreement, art. II). The 2001 Agreement states that it expires on June 30, 2006, but will automatically renew for another year if neither party exercises its right to terminate the Agreement pursuant to the Renewal Clause. (2001 Agreement, art. XV.)

Article IV, section 4 of the 2001 Agreement requires that the employer use only subcontractors who are signatory to a CBA with the District Council for all work that is covered by the Agreement.

Article IX of the 2001 Agreement contains an arbitration provision encompassing all disputes "concerning the application, interpretation, effect, purpose or breach of any term or condition of this Agreement" or any "claim, demand dispute or controversy between the parties hereto . . ." (2001 Agreement, art. IX, § 2.)

3

On November 16, 2005, the District Council concluded that Seabury had been engaged in covered work for approximately two days and that this work had been subcontracted to a company that was not a signatory to a CBA with the District Council, in violation of article IV section 4.

On November 18, 2005, the District Council filed a grievance pursuant to article IX of the Agreement.

By letter of November 29, 2005, Seabury, through counsel, stated that it would not attend the scheduled grievance hearing because it was no longer a signatory to any agreement with the District Council, maintaining that it was only signatory to the Agreement that expired on June 30, 1996.

**Seabury Is Bound by the Interim Agreement**

National labor policy favors arbitration as a form of dispute resolution. United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 596 (1960). In the labor relations context, any doubt that a dispute is arbitrable must be resolved in favor of arbitrability so long as the arbitration clause in question is susceptible to an interpretation that it covers the dispute. AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)); see also New

4

York's Health and Human Servs. Union v. NYU Hosps. Ctr., 343 F.3d 117, 119 (2d Cir. 2003) (holding that an order to arbitrate should not be denied, and any doubt should be resolved in favor of arbitrability).

The Interim Agreement, which was signed and executed on behalf of Seabury on August 30, 2001, extended the 1996 Agreement until such point as a successor agreement was reached. By signing the Interim Agreement, Seabury agreed to be bound under the successor agreement. (See Interim Agreement, arts. I, II.) Seabury was furnished with a copy of the 2001 agreement on September 24, 2001. While Seabury did not sign and return a copy of that agreement to the District Council, it had already agreed to adopt that agreement by signing the Interim Agreement, which provided that "our firm shall be bound to the terms contained in the New Agreement(s) retroactive to July 1, 2001, by virtue of executing this agreement, regardless of whether it actually executes a successor agreement." (Interim Agreement, art. V.)

Seabury has contended that arbitration agreements must be explicit, written, and "must not depend upon implication or subtlety." (Pet'r's Mem. at 2, citing In re Arbitration between Waldron and Goddess, 61 N.Y.2d 181 (1984)). However, the arbitration provision contained in Article IX of the 2001 Agreement is set forth explicitly and in writing and does not depend on implication, subtlety, or construct.

5

The cases upon which Seabury has relied do not concern arbitration clauses contained in CBAs, or the compelling federal labor policy that favors the enforcement of such provisions under § 301 of the LMRA.

The CBA between Seabury and the District Council is governed by § 301 of the LMRA, and the federal labor policy developed thereunder which strongly favors arbitration as an alternative dispute resolution mechanism. See, Coca-Cola Bottling Co. of N.Y., Inc. v. Soft Drink and Brewery Workers Union Local 812, 242 F.3d 52, 53 (2d Cir. 2001) (holding that Federal Arbitration Act does not apply to cases brought under the LMRA).

Seabury has asserted there is "no evidence of [sic] whatsoever that [it] intended to be bound by the arbitration provisions of the [2001 Agreement]." (Pet'r's Mem. at 4.) However, article II of the Interim Agreement specifically refers to the arbitration provisions of the successor contract as a term and condition of the "New Agreement" that will be binding on it retroactive to July 1, 2001. There is no dispute Seabury signed the Interim Agreement. By the terms of the Interim Agreement, Seabury agreed to the terms and conditions of the New Agreement, including arbitration.

The Interim Agreement must be viewed in light of the common practices of the construction trades industry. The

6

construction industry typically engages in what is known as "pattern bargaining." The District Court for the District of South Dakota succinctly summarized this process and the policies behind it in <u>John Morrell & Co. v. United Food and Commercial Workers Int'l Union</u>, 825 F. Supp. 1440, 1443 (D.S.D. 1993):

> UFCW and the meat-packing employers (including Morrell) engaged in what is commonly known as "pattern bargaining." In each round of negotiations, one meat-packing company and UFCW would reach an agreement which would "set the pattern" for the meat-packing industry, and the other companies would then adopt the same provisions as a means of equalizing labor costs. This pattern bargaining resulted in the same wages and benefits and working conditions for all employees and retirees in the meat-packing industry.

As of the date that Seabury executed the Interim Agreement it had been a signatory for several years and knew the benefits and obligations of being a signatory contractor.

An agreement to be bound by the results of multi-employer pattern bargaining does not bind a party "to a set of contractual obligations that he never knowingly assumed." A contractor, like Seabury, that makes such an agreement has sufficient knowledge of obligations it has assumed, because it has obligated itself to conform to the industry standards that are required by the unionized construction contracts it seeks to be awarded.

Multi-employer pattern bargaining is not just an industry standard, it is Seabury's own past practice and course of dealing

7

with the District Council. Like the 2001 Agreement, the 1993 and 1996 Agreements to which Seabury was a signatory were no different from the Independent Millwright Agreements between the District Council and other independent employers.

The 1996 Agreement, to which Seabury admits being party, and the 2001 Agreement are identical in every material respect. Virtually the only difference between these two agreements is that there are modest increases in the wage and fringe benefit rates. This too is an industry standard, and one that Seabury was well aware of when it signed the Interim Agreement.

The Interim Agreement is sufficient to bind Seabury to the 2001 Agreement. The Interim Agreement expressly provides that Seabury agrees to be bound by the arbitration provisions of the 2001 Agreement. As is the case with an "evergreen" provision of a CBA, Seabury's argument that the arbitration term of the Interim Agreement is not effective is for an arbitrator to determine. See Abram Landau Real Estate v. Bevona, 123 F.3d 69, 73 (2d Cir. 1997).

### Seabury Also Is Bound by Its Subsequent Conduct

A CBA does not have to be signed by the employer to be effective. An employer's intent to adopt an agreement may be evidenced by its conduct of complying with some of its terms. See Brown v. C. Volante Corp., 194 F.3d 351, 354-55 (2d Cir. 1999)

8

(holding that employer's intent to adopt CBA that it had not signed was established by, <u>inter alia</u>, filing of 61 benefit fund contribution remittance reports in accordance with terms of agreement). Where an employer is furnished with a successor CBA, and then begins to perform under its terms, it has accepted that contract regardless of whether or not it signs the successor agreement. <u>See Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp.</u>, 258 F.3d 645, 649 (7th Cir. 2001). This principle extends to express arbitration clauses contained in CBAs. <u>See Local 32BJ v. Coby Grand Concourse, LLC</u>, 2006 WL 692000, at *4 (S.D.N.Y. 2006) (holding that employer "implicitly" assumes CBA, including arbitration clause, by acting in conformity with provisions and obligations of agreement, and vacating arbitration award on other grounds).

Seabury availed itself of the benefits and complied with the terms of the 2001 Agreement. For instance, the cover letter of September 24, 2001 that was enclosed with the 2001 Agreement notified Seabury that the Agreement had been amended so as to increase the required surety bond (securing benefit fund contributions) from $5,000 to $10,000. On May 1, 2002, Seabury purchased the required $10,000 surety bond from Carolina Casualty Insurance Company.

Seabury also requested millwrights from the District Council's Out-of-Work list. Shop steward reports show that the

9

District Council dispatched millwrights to Seabury for at least seven weeks in connection with a Seabury job at the Jamaica Water Treatment Plant.

Furthermore, as in <u>Brown</u>, where the employer was found to have adopted a CBA because it contributed to the union's benefit fund over a period of years, Seabury has consistently made the proper contributions to the various fringe benefit funds as required under the Agreement since 2001. The LMRA prohibits an employer from contributing to a union's ERISA trust fund unless done pursuant to a valid written agreement, and provides that a violation of this rule is a felony, punishable by up to $15,000 in fines, and imprisonment for up to five years. <u>See</u> LMRA § 302(c)-(d), 29 U.S.C. § 186(c)(5)(B),(d).

Like the employer in <u>Operating Engineers Local 139</u>, Seabury paid the higher rates required under the 2001 Agreement and complied with the five increases that were required at various intervals over a five year period.

Furthermore, during the relevant time period (July 1, 2001 to the present), Seabury has permitted the District Council to audit its books and records on three separate occasions, in compliance with article XI, section (1)(c) of the 2001 Agreement.

10

In <u>Local 32BJ v. Coby Grand Concourse, LLC</u>, the court explicitly rejected an argument similar to the one now put forward by Seabury (<u>i.e.</u>, that it is not a party to the agreement because it refused to sign it). While the court noted that it "should not impose the obligations of a contract onto a party who has not agreed to or adopted said contract," it found that the employer implicitly assumed the contract "by acting in conformity with the provisions and obligations of that agreement in all respects." 2006 WL 692000, at *4. The court stated that it was most significant that employer "not only continued to pay Union workers at the prevailing wage and make contributions to both health and pension funds at the prevailing rates specified in the CBA, but paid wage and fund contribution rate increases in accordance with the very schedule specified in the CBA." <u>Id.</u>

In <u>Coby</u>, the employer put forth evidence of its intent not to assume the agreement, including the fact that, as the court observed, "it declined the Union's request that [the employer] explicitly assume the CBA by executing an assumption agreement." <u>Id.</u> Nonetheless, the court found that "this sort of conduct is not dispositive on the issue of whether a party implicitly assumed an agreement." <u>Id.</u> (citing <u>Brown v. C. Volante Corp.</u>, 194 F.3d 351, 356 (2d Cir. 1999)). The court concluded:

> Given [the employer's] conduct in complying with all relevant terms of the CBA, including (and most tellingly) wage and fund contribution rate increases specified in the CBA schedule, coupled with the complete absence on

11

> the record of any express disavowals by Coby, I find that, based upon the specific facts of this case, Coby implicitly adopted the CBA. As a result, Coby was bound to arbitrate certain disputes according to the CBA's terms.

Id.

Seabury's conduct is similar to the conduct of the employers in certain of the cases that support the proposition that an employer will adopt an unsigned CBA by availing itself of the benefits of the agreement and by complying with its terms. See, e.g., S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc., 359 F.3d 1127, 1133 (9th Cir. 2004); U.S. Can Co. v. NLRB, 984 F.2d 864, 869-70 (7th Cir. 1993) (upholding Board decision that successor employer had assumed agreement, based in part on court's view that dues check-offs and deductions imply "existence of a real agreement" between employer and union); NLRB v. Amateyus, Inc., 817 F.2d 996, 997-98 (2d Cir. 1987) (finding that successor employer adopted predecessor's CBA where it complied with agreement regarding hours, wages, holidays, and layoff procedures); Arco Elec. Co. v. NLRB, 618 F.2d 698, 699-700 (10th Cir. 1980) (finding that company adopted CBA during negotiations by availing itself of benefits of union hiring hall for referral of employees, deducting union assessments and remitting them to union, making appropriate deductions for various union funds, and paying contract employees according to the wage scale called for in CBA); E.S.P. Concrete Pumping, Inc., 327 NLRB 711 (NLRB 1999) (holding

12

that employer adopted previous CBA by complying with terms of agreement by deducting and remitting dues, paying union wages and benefits, and representing itself as union business); Scandia Stucco Co., 319 NLRB 850, 855 (1995).

Seabury has maintained that it was not a party to the 2001 Agreement because it did not sign that Agreement when it received it in September of 2001. However, when Seabury proceeded to avail itself of that Agreement over the next five years, and was awarded contracts that require union labor and union-sponsored apprenticeship programs, Seabury was bound under the contract.

### The Renewal Provision Does Not Void the Agreement

Seabury has contended that the 2001 Agreement is void as a contract of infinite duration which furnishes no contingency for full performance because the renewal provision (Article XV) provides only for amendment or modification of the existing contract, or negotiation of a new one, without the possibility of termination.

However, the renewal clause states that the contract will renew "unless" either party gives notice that it wants to amend the contract. Thus, the renewal clause provides for termination of the contract at the expiration date upon proper notice.

13

If a majority of the employees have elected to be represented by a particular union, the expiration of a contract will not mean that the employer ceases to be a union employer, or that the union ceases to be the exclusive bargaining representative of the employees. As the Supreme Court observed over forty years ago, "a collective bargaining agreement is not an ordinary contract," nor is it in "any real sense the simple product of a consensual relationship," and ordinary contract principles do not always apply. John Wiley & Sons v. Livingston, 376 U.S. 543, 550 (1964); see also Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp., 258 F.3d 645, 649 (7th Cir. 2001) ("[T]he common law that the federal courts have devised to govern disputes arising out of collective bargaining contracts and ERISA plans does not coincide at every point with the general law.").

Once a court determines that the parties have agreed to arbitrate, the validity and meaning of specific provisions within the agreement to arbitrate is a matter for the arbitrator to decide. Ciago v. Ameriquest Mortgage Co., 295 F. Supp. 2d 324, 330 (S.D.N.Y. 2003). The Second Circuit has explicitly held that where there is a broadly phrased arbitration clause the validity of a renewal or "evergreen" clause is an issue for the arbitrator. Abram Landau Real Estate v. Bevona, 123 F.3d 69, 73 (2d Cir. 1997). Since the 2001 Agreement, as well as its predecessors, contains a broadly phrased arbitration clause, the validity of the renewal clause is an issue for arbitration, not a barrier to it.

14

Furthermore, even if the renewal clause were to be found defective, that clause is severable from the Agreement pursuant to article XIV's savings clause and general principles of contract law and labor relations.  The savings clause provides:

> If any court of competent jurisdiction decides that any clause or part of this Agreement is unconstitutional or illegal, or should any clause or part of this Agreement is [sic] found contrary to present or future laws, it shall not invalidate remaining provisions of this Agreement, it being the sole intent and purpose of this Agreement to promote peace and harmony in the industry, as permitted by law.

The renewal clause does not render the contract void, even if Seabury's interpretation were accepted.

**Conclusion**

For the reasons set forth above, the motion of the District Council is granted, the cross-motion of Seabury is denied, and arbitration will be compelled.

It is so ordered.

New York, NY
November  /0  , 2006

ROBERT W. SWEET
U.S.D.J.

15